# EXHIBIT 1

## AMERICAN ARBITRATION ASSOCATION
## COMMERCIAL ARBITRATION TRIBUNAL

**DREAM MEDICAL GROUP, LLC AND**

**JOSEPH A. AGRESTI, BIJ MOTORS TX, LLC,**

| | | |
|---|---|---|
| **BIJ LA, LLC** | § | |
| *Claimant/Counter-Respondents,* | § | |
| | § | |
| **vs.** | § | |
| | § | **CASE NO. 01-20-0014-3854** |
| **Old South Trading Co., LLC, and** | § | |
| **Brendan Church** | § | |
| *Respondent/Counter-Claimants.* | § | |

---

## FINAL ARBITRAL AWARD

---

WE, THE UNDERSIGNED ARBITRATOR PANEL,

Honorable Dwight Jefferson, Lee Kaplan, and Honorable Scott Link having been duly designated, appointed, approved and sworn to serve in this proceeding, having duly read the Motions, Responses, Post Hearing Briefs, and considered the proof provided during the hearing, awards as follows:

### I. THE PARTIES

1. The Claimants in this matter are Dream Medical Group, LLC ("DMG"), Joseph Agresti ("Mr. Agresti"), BIJ Motors Texas, LLC ("BIJ TX"), and BIJ LA, LLC ("BIJ LA", collectively with DMG, Mr. Agresti and BIJ TX, the "Claimants" or "Dream"). **Transcript of Arbitration Hearing ("TR") at page 1.**

2. DMG was formed under the laws of the State of Delaware on or about April 27, 2020, and sells personal protective equipment ("PPE") and is owned by Mr. Agresti. **TR 178:11-20.**

3. DMG had over $181 million in revenue in 2020, with an average profit margin of 40% in

2020. **TR 311:9-312:20**

4. BIJ TX is owned by Mr. Agresti and is commonly known and operates as Mercedes Benz of the Woodlands. **TR 179:12-24; Ex OST-295(2)**.

5. BIJ LA is owned by Mr. Agresti and operates as a Mercedes Benz dealership located in Baton Rouge, Louisiana. **TR 179:12-24; Ex OST-295(2).**

6. In addition to DMG, BIJ TX and BIJ LA, Mr. Agresti currently owns interests in and/or operates four other automobile dealerships. **TR 166:14-20**.

7. Mr. Agresti graduated from Rutgers University in 1994 with a BS in accounting and a minor in statistics, and upon graduation began working at Arthur Anderson**. TR 256:23-25**.

8. Mr. Agresti is also a partner in a hedge fund called GFQ1 (the "Hedge Fund"). The Hedge Fund apparently loaned monies to DMG relative to and to facilitate some of the Transactions between Dream and Old South. **TR 175:3-177:25, 249:4-250:25.**

9. Most of Agresti's companies are 99% owned by either Dream LT. II or Dream LT., LLC and 1% by Agresti. **TR 283:24 – 285:22**

10. Robert Plott, Esq. ("Attorney Plott"), a counsel for Claimants in this matter, is also one of six or seven partners in the Hedge Fund, with at least $250,000 personally invested in the Hedge Fund, and has a personal financial stake in the outcome of this matter. **TR 175:3-177:25, 249:4-252:25.**

11. Nick Saban is also a partner or otherwise has a financial interest in the Hedge Fund, as does Attorney Plott's uncle, John Plott. **TR 175:3-177:25**.

**The Respondents**

12. The Respondents in this matter are Old South Trading Co., LLC ("OST") and Brendan Church ("Mr. Church"), (collectively with OST, the "Respondents" or "Old South").

13. Mr. Church attended one year at Western Carolina University. After one year of college, Mr. Church left and thereafter worked for several different restaurants, before going to work for a BMW dealership as a salesman in or about 2007. **TR 511:5-515:4.**

14. In 2012, after leaving BMW, Mr. Church started OST, the purpose of which was the export of automobiles to China for resale. **TR 517:1-25**

15. Mr. Yang Wang ("Mr. Wang or "Owen") owns TBC Global ("TPC") an import company, and is a close friend and long-time trusted business associate of Old South, having worked

closely with Old South since 2012. **TR 518:25-521:3; 523:8-524:16.**

16. The Panel considered both Claimants and Respondents to be sophicated in business affairs, with access to outside expertise, including legal expertise, when required.

## II. DISCUSSION

17. In late January 2020, due to the COVID-19 pandemic, Old South stopped exporting automobiles to China. **TR 521:4-11.**

18. At or about that same time, a business associate contacted Old South and inquired whether Old South might be able to obtain PPE such as surgical and KN95 masks for resale. **TR 521:11-522:9.**

19. In turn, Old South contacted Owen and by early March of 2020, Old South had made its first purchase of PPE through Owen from China for import and resale in the United States. **TR 524:17-532:12.** 17. As between Owen and Old South, Owen would locate and inspect PPE in China through his contacts, and once suitable product was located, Old South would wire Owen the entire amount due for the masks,  who would in turn, pay the factories for the PPE prior to its export from China. **TR 535:13-537:8.**

20. On or about March 25, 2020, Mr. Agresti and Mr. Church were first introduced through email by a mutual friend, Brad Saia. **TR 547:6-548:14.**

21. On or about March 29, 2020, Mr. Church and Mr. Agresti spoke by phone, at which time Mr.  Church informed Mr. Agresti that he was looking for approximately $1 million in capital to facilitate large purchases of PPE for import and resale. **TR 549:8-552:1.**

22. Mr. Agresti was not interested in being a lender. Instead, he saw an opportunity to make money and wanted to participate in the resale of PPE in the U.S. **TR 549:8-552:1, 557:24-559:14; Ex OST-295(8).**

23. During that conversation the two also discussed their respective backgrounds, and discussed that they could work with one another in the PPE business, with Old South as the supplier and Dream as the distributor. **TR 564:8-565:12. Transaction # 1**

24. Four days after their first telephone call, on April 3, 2020, Dream placed its first order with Old  South. ("***Transaction # 1***") for KN95 Masks (the "Transaction #1 Masks"). **TR 559:15-24; Ex OST-295(10).**

25. 23. The Transaction #1 Masks were ordered from Old South via telephone by Mr. Agresti. Subsequent to the telephone conversation, and pursuant to Mr. Agresti's instructions, Old South sent Mr. Agresti and BIJ LA an invoice to confirm the order. **TR 559:21-560:23; Ex OST-295(10).**

26. BIJ TX paid the costs associated with the invoice for the Transaction # 1 Masks. **TR 561:1-10; Ex  OST-295(11).**

27. Transaction # 1 was a resounding success, and Dream benefitted from Old South's performance. **Ex OST-17.**

28. As it related to the manner in which the parties conducted business, Dream never issued an official  purchase order (a "PO") for any masks that ordered from Old South. Thus, no formal PO exists from Dream to any party for any of the Transactions that occurred between Dream and Old South. Instead, all of Dream's orders were placed by, or at the direction of, Mr. Agresti to Mr. Church though email, text, or telephone, and Old South would then issue an invoice to Dream confirming the order. **TR 303:21-304:2, 305:7-306:7: Exs OST-6, G-7 at  p. 92.**

29. On many occasions, after Dream had placed an order, Mr. Agresti and Mr. Church would continue  to negotiate over and/or amend certain details of an order such as delivery dates or location, or deposit amounts or even price per unit, but until much later, such negotiations did not result in cancellation of any order. **TR 305:7-306:7.**

30. In early 2020, the FDA created an Emergency Use Authorization List (the "EUA List") setting forth the brand of imported KN95 masks that were considered FDA-approved for emergency use  authorization. **Ex OST-16.**

31. Moway Brand Masks were one brand of KN95 masks Old South could supply to Dream. As of  early April 2020, Moway Masks were FDA registered, but not yet on the EUA list. **TR 576:8-21.** 32. On April 14, 2020, Dream informed Old South it had a "high up" FDA connection who could help get Moway brand KN95 Masks on the FDA-approved EUA List. **TR 574:9-575:18; Exs OST-15, OST-16, OST 18**.

32. Prior to entering into the business relationship with Dream, Old South had hired a third-party  company to make a brochure for Old South that it could send to its prospective buyers (the "OST Brochure"). **TR  580:2-581:5; Exs OST-18, OST-19.**

33. Shortly after entering into the business relationship with Dream, in early April 2020, Old

South  shared the OST Brochure via email with Mr. Agresti and Patrick Daly. Thereafter, and continuing through May 2020, Dream and Old South worked to transform the OST Brochure into what Dream represented to Old South  would be a mutual PPE marketing brochure. **See, e.g., TR 580:2-581:24, 583:8-585:7; 588:7-589:25, 633:22- 634:21; Exs OST-18, OST-19, OST-20, OST-21, OST-22, OST-23, OST-24, OST-34, OST-35, OST-70, OST 71, OST-72.**

34. Dream told Old South that DMG would be noted in the mutual brochure as the seller, and OST  would be noted expressly as DMG's supplier. **TR 580:2-581:24; Ex OST-18, OST-19, OST-20, OST-21, OST 22, OST-23, OST-24.**

35. However, soon after receiving the OST Brochure, Dream suggested that it would be better to leave  out Old South's contact information because Mr. Church was so busy and wouldn't be able to field calls and Mr.  Agresti and Mr. Daly could field calls for him. **TR 580:2-581:24; Ex OST-18, OST-19, OST-20, OST-21, OST 22, OST-23, OST-24.**

36. The OST Brochure was Transformed by Dream into a brochure that mentioned only DMG and not Old South (the "DMG Brochure"). **TR 580:2-581:24, 583:8-585:7; 588:7-589:25; Exs OST-18, OST-19, OST-20, OST-21, OST-22, OST-23, OST-24, OST-34, OST-35.**

37. Old South continued to assist Dream with the DMG Brochure well into May 2020. **TR 588:7-25, 633:22-634:21: Exs OST-34, OST-35, OST-70, OST 71, OST-72.**

38. On April 16, 2020, Dream placed an order via email with Old South for 5 Million Moway Brand  KN95 Masks (the "5 Million Moway Transaction # 2 Masks") at a purchase price of $11,500,000. (Transaction #  2)*.*

39.  After receiving the email order, Old South issued an invoice to Mr. Agresti and BIJ LA, and BIJ   TX paid the $11,500,000 purchase price to OST the following day from the account of BIJ TX. **OST-31, OST 32.**

40. On more than one occasion during April 2020, Dream asked Old South, and Old South agreed   to store masks Dream had ordered at Old South's warehouse in Greer, South Carolina. **TR 593:10-595:22, 597:6- 598:7; Exs. OST-38, OST-39, OST-40, OST-41, OST-42.**

41. When Dream ordered the 5 million Moway Transaction # 2 Masks, Dream requested that Old South take the masks to Old South's warehouse to be stored. **TR 614:8-16.**

42. To finance Transaction #2, Agresti  lent Dream $11,500,000 from his car dealership

business. **TR 263:3-11**

43. Between April 4, 2020 and October 2, 2020, Dream and Old South engaged in dozens of transactions involving all manner of PPE, none of which are at issue in this matter apart from those specifically noted at the Trial of this cause.  Up until late May, 2020, the parties discussed a relationship that would be of lasting duration. **Exs OST-38, OST-39, OST-40, OST-41, OST 42, OST-78**.

44. For example, on April 17, 2020, Dream introduced Old South to the head of Delta Airlines Cargo,  under the auspices that Delta Cargo could supply Dream and Old South with planes to fly into certain areas in China  to obtain Moway Brand KN95 Masks. **TR 590:7-593:3; Exs OST-36, OST-38**.

45. On April 20, 2020, at approximately 4:30 p.m., Dream emailed Old South seeking information for  a proposal to United Airlines to fill a potential recurring order for 5 million masks per month. **Ex OST-46**. 45. Between April 21, 2020 and May 5, 2020, Claimants and Respondents: (1) communicated daily as to the status of both the 5 Million Moway Transaction # 2 Masks and the 7 Million Transaction # 3 (see below) Masks and (2) were contemplating doing such a volume of business together that Mr. Agresti connected Mr. Church with his accountant so the Parties could discuss tax implications to both Old South and Mr  Church of moving his and Old South's residence from South Carolina to Texas mid-2020, in furtherance of the  Parties' potential long-term business venture. **TR 591:1-592:14, 597:4-599:11, 595:2-19; Exs. OST-38, OST 39, OST-40, OST-41, OST-42, OST-46, OST-47; OST-61**

46. On April 20, 2020, at 8:51 p.m., Dream placed an order ("Transaction # 3") via email for 7 million  KN95 Masks at a price of $2.30 (the "7 Million Transaction # 3 Masks"), and requested that payment not be due  until the masks arrived, which meant Old South would need to prepay the purchase price for the 7 Million Transaction #3 Masks up front. Ultimately, the parties negotiated the price to $2.25 per mask.[3] **TR 599:19-600:4, 625:18-626:3, 629:22-360:9; Exs OST-47, OST-48, OST-49, OST-50, OST-51, OST-52, OST-55, OST-56,  OST-65; OST-83**.

47.  After some negotiations via email and telephone, the parties agreed to a price of $2.30  per mask for the 7 Million Mask order, and Old South issued an invoice to Dream for the 7 Million Masks    ("Transaction # 3"). **TR 604:1-15, 607:1-608:17, 609:19-610:7; Exs**

**OST-49, OST-50, OST-51, OST-52, OST 83, OST-296(27).**

48. By email dated 4/21/20, Mr. Agresti confirmed his order for 7 Million Masks ordered through  Transaction # 3 and told Old South to send him information showing how much he needed to pay Old South and when. **TR 623:18-624:6; Ex OST-65**.

49. Dream stated that it could not pay the purchase price up front, but would pay for the 7 Million Transaction # 3 Masks upon their arrival, which Old South estimated would be sometime in the second  week of May 2020. **TR 623:18-624:6; Ex OST-65.**

50. Old South immediately placed the order for the 7 Million Transaction # 3 Masks. **TR 611:5-20 TR 620:5-8.**

51. The 7,000,000 mask order comprised of 5,000,000 Chengde masks and 2,000,000 Baiyi masks. **TR 645:6-10**

52. A few days later, at the invitation of Mr. Agresti, Mr. Church traveled with his wife to Houston to  meet Mr. Agresti in person. During that visit, Mr. Agresti and Mr. Church discussed business, and Mr. Church informed Mr. Agresti that the 5 Million Moway Brand Masks ordered through Transaction  # 2 were going to arrive late due to customs issues in China. Although Mr. Agresti was not pleased that the  Transaction # 2 masks would be late, Dream did not cancel the 5 Million masks ordered through Transaction # 2 or the  7 Million Masks ordered through Transaction #3. **TR 626:5-628:14, 631:19-633:21**.

53.  On April 23, 2020, Church sent an email to Agresti quoting a price for 7,000,000 masks and stating the following: "I think we need a written agreement between you and [Old South] for this transaction." (Exh. 7-15).

54. On April 26, Agresti sent an email to Church summarizing the parties' dealings to date, confirming there was no agreement in place, and confirming that in two separate instances, Church had "lost" his availability to secure any potential 7,000,000 masks. (Exh. 7-24). Later on April 26, Agresti sent another email confirming he had an option **but no obligation** to purchase 7,000,000 masks; Church replied "Yes. All good." (Exh. 7-26, OS1202).

55. On April 25, 2020, Dream contacted Old South seeking more information on Old South's KN95  products for inclusion in the DMG Brochure. **TR 637:17-638:9; Exs OST-78.**

56. In response, Old South sent Dream information as to eight different suppliers used by Old South.  **TR 638:7-24; Ex OST-80**

57. By June 9, 2020, Dream had taken the OST Brochure and Transformed it into the DMG Brochure by removing all references to Old South, and replacing all former references to Old South with information showing BYD as DMG's supplier. **TR 732:1-734:25; Exs OST-194, OST-195, OST-196, OST-197, OST-198.**

58. By email dated April 26, 2020, Dream once again confirmed the order for the 7 Million Transaction #3 Masks (of no specific brand), with a purchase price of $2.30 for each mask, to be paid for by Dream on arrival. Although no specific brand had been designated for the 7 Million Transaction #3 Masks, as of April 26, 2020, the parties believed 2 of the 7 Million Transaction # 3 Masks would come from one manufacturer, and the other 5 million from another manufacturer. **TR 639:12-640:17; Ex OST-81.**

59. As of April 26, 2020, the 7 Million Transaction #3 Masks had already been ordered based on the agreement reached between Dream and Old South on the 21st for 7 Million Masks at $2.30 per mask**. TR 642:20- 645:10; Ex 81**.

60. Following the April 26, 2020 email exchange, additional communications between Mr. Agresti and Mr. Church occurred that same day via both telephone and email, wherein Mr. Church assured Mr. Agresti the 7 Million Transaction #3 Masks had been ordered and were on the way and still available. In this email Old South also agreed to sell Dream the 7 Million Transaction #3 Masks at $2.25 per mask, without a deposit. **TR 641:11-18, 649:5-650:11; Ex OST-82, OST-83.**

61. By email dated April 27, 2020, Old South informed Dream that 2 million of the 7 Million Transaction #3 Masks would be coming from a different manufacturer than originally thought, and Dream agreed to the change. **TR 653:7-655:21; Ex OST-84.**

62. By email dated April 29, 2020, Mr. Agresti confirmed the intent to pay for the 7 Million Transaction # 3 Masks. **TR 663:10-20.**

63. On April 28, 2020, Old South sent Owen $3 million towards the purchase price of the 7 Million Transaction #3 Masks, as well as another $4 million on May 7, 2020. **TR 656:3-15**.

64. Old South also informed Dream that there would likely be a delay in the delivery date of the 5 Million Moway Transaction # 2 Masks. **TR 192:24-193:3; Ex OST-88.**

65. By email dated May 3, 2020, Old South informed Dream there would be yet an additional delay in the arrival of the 5 Million Moway Transaction # 2 masks, but that they would

still arrive the first week or so of May. Dream did not cancel the Transaction # 2 order. **TR 664:14- 665:18; Ex OST-113.**

66. By email dated May 4, 2020, Mr. Agresti informed Mr. Church that he would be speaking with Stephan Hahn ("Mr. Hahn"), the then FDA Commissioner by telephone the following day. Mr. Agresti told Mr. Church that he was going to ask Mr. Hahn questions regarding what was happening within the U.S. as to the sale of PPE and the EUA List, and told Mr. Church to put together some questions for Mr. Agresti to ask Mr. Hahn. **TR 668:13-670:2; Ex OST-120.**

67. By email sent 3:35 pm on May 5, 2020, Mr. Agresti confirmed he had spoken to Mr. Hahn the prior day, and provided Mr. Church with answers purportedly confirmed by his conversation with Mr. Hahn in response to three questions Mr. Church had posed. **TR 668:13-672:18; Ex OST-120.**

68. Based on his conversation with Mr. Hahn, Mr. Agresti was aware as of May 5, 2020 that getting PPE, including but not limited to Moway brand Masks on the EUA List would be difficult going forward. **TR 668:13-672:18; Ex OST-120.**

69. To purchase masks from China, the manufacturer must receive payment; the masks are inspected by the Chinese government; the masks are flown to Los Angeles; checked through customs, and trucked to Mr. Church's storage facility. **TR 387:14- 388:18**

70. Mr. Agresti introduced Mr. Church to Delta Cargo which had the same difficulty with on-time deliveries. **TR 591:10 – 592:14**

71. On May 5, 2020, Dream sent Respondents the proposed Resolution Agreement and demanded it be executed before day's end. **TR 673:2-16; Exs Y-1, Y-12, G-10, OST-29, OST-104, OST-121, OST-124, OST-296(D), OST-296(G).**

72. Moway masks were never on the EUA list. **TR 331:18-25** However, Moway masks were FDA registered. **TR 586:1-3**

73. The Resolution Agreement was drafted by Attorney Plott. At the time he drafted the Resolution Agreement, Attorney Plott had knowledge that Old South was represented by legal counsel Tucker Herndon at Burr & Forman LLP. **TR 239:3-14.**

74. The Resolution Agreement required Old South to agree to allow Dream to essentially rescind Transaction # 2 by allowing Dream ten days from May 5, 2020 to decide whether it wanted to: (a) keep all 5 Million Moway Brand Masks; or (b) return 2 million (*or 2/5*) of

the 5 Million Moway Masks from *Transaction # 2* without cause, and receive a refund of almost 50% of the entire purchase price of the 5 Million Moway Masks from *Transaction # 2*. **TR 678:9-682:25; Ex OST-122**

75. The Resolution Agreement also provided Dream with the option to order an additional 2,030,000 KN95 Yiwu Brand Masks (in hindsight, to replace the 2 Million KN95 Moway Masks being returned without cause for a much cheaper price), at a purchase price that was over $1 million less than what Claimants had paid for the Moway Brand masks just two weeks earlier. **TR 678:9-682:25; Ex OST-122.**

76. Dream purchased 2,030,000 YIWU masks for $4,567,000. **TR 362:20- 363:1**

77. Mr. Plott and Mr. Agresti (on behalf of Dream) had attempted to negotiate a supply agreement with Mr. Herndon, Counsel for Mr. Church. **TR 367:12 – 368:10**

78. After the parties could not reach a supply agreement, Mr. Plott sent the Resolution Agreement directly to Mr. Church. **TR 369:8 – 370:3**

79. Mr. Church and OST initially refused to sign the Resolution Agreement, and responded to Mr. Agresti, "*like you taught me, I would never be dumb enough to sign this.*" **TR 344:24-345, 675:1-3; Y-12**.

80. Minutes thereafter, Mr. Agresti called Mr. Church and a telephone conference in which Church contends Agresti fraudulently included him to sign the Resolution Agreement. **TR 372:1-22; 675:1-676:14**.

81. During the May 5th call, Mr. Church alleges Mr. Agresti represented to him that: (1) the Resolution Agreement was all for show, and was needed simply to calm Dream's investors (2) Mr. Agresti's "hedge fund" and "investors" were uncomfortable or nervous because the 5 Million Moway Masks from *Transaction # 2* were late and (3) Claimants were going to lose or had already lost a "huge deal" for the sale of 2.5 million masks to the state of Louisiana that would cause Claimants to lose a great deal of money; (4) Dream needed the money they would make from the sale of the Transaction #2 masks to be able to fund the rest of the Transactions he intended to complete with Old South; (5) Dream intended to buy the 7 Million Masks from Transaction # 3 (6) Claimants would never attempt to enforce the Resolution Agreement; (7) once the investors' fears were calmed, Claimants would be free to go ahead and pay Respondents for the entirety of the 7 Million Masks they had ordered through Transaction # 3; (8) that what they'd already done was the tip of

the iceberg as far as the hundreds of millions they  were about to do in business together; and (9) Dream and Old South were "in this together."[4] **TR 194:1-195:25,  332:21-338:6, 338:7-342:16, 342:25-343:7, 366:4-17, 675:1-676:12; Exs OST-96, OST-104, OST-121, OST 122, OST-124, Y-1, Y-12, G-10.**

82.  Mr. Agresti remembers only that he he allegedly advised Mr.  Church regarding changes to two particular provisions of the Resolution Agreement. **TR 224:10-14, 372:1**

83. Apparently, Mr. Agresti could have known the Chinese masks would be removed from the EUA before he sent the Resolution Agreement. **TR 672:20 – 673:23; EX 187**

84.  After the May 5 call ended, Mr. Agresti conditioned the payment of the Yiwu masks that had already been ordered by Old South on his behalf, until and unless Old South agreed to sign the Resolution Agreement. **TR 362:6-365:12, 365:18-365:22; Ex Y-14, Y-16, G-10.**

85. On or about May 6, 2020, the 5 Million Moway Transaction #2 Masks arrived in Los Angeles  Airport ("LAX"). **TR 693:2-10.**

86. On or about May 8, 2020, Old South caused 2.5 million of the 5 Million Transaction # 2 Masks to  be delivered to the State of Louisiana. 2,500,000 of these masks were eventually sold by Dream to Louisiana for $8,000,000.  **TR 684:2-689:21**

87. At the request of Mr. Agresti, Old South agreed to store 2 million of the 5 Million Moway Transaction #2 Masks in Old South's warehouse. **TR 684:2-689:21**.

88. Dream sent an additional 500,000 of the 5 Million Moway Transaction # 2  Masks to be stored at Old South's warehouse, resulting in a total of 2.5 million of the 5 Million Transaction #2  Masks being delivered to Old South's warehouse for storage. **TR 684:2-25**.

89. Old South claims it would not have agreed to store the Transaction #2 Masks if it had known Dream had  intended to later reject the Transaction # 2 Masks or refuse to sell them, and instead, would have delivered all  2,500,000 Masks to Mr. Agresti's lake house. **TR 684:2-685:10; 705:1-706:10; Ex OST-146.**

90. The YIWU masks arrived in Los Angeles on May 6, 2020. At the time they were shipped from China, the YIWU masks were EUA approved. **EX Y-17**

91.  Mr. Church paid $1.95 per mask for the 2,030,000 YIWU masks, and charged Dream $2.25 per mask. **TR 442:5 – 21, EX Y-14**

92. The payment for the YIWU masks were due at the time of departure from Los Angeles**,**

not at the time of the invoice from Church. **TR 443:2 – 444:16, EX Y-15**

93.  On or about May 7, 2020, the FDA removed all brands of KN95 masks from the EUA List, but for a KN95 mask manufactured by 3M. **TR 693:12-694:4, 709;11-23; Exs OST-134, OST-151.**

94.  That same day, Dream and Old South corresponded by email regarding ways Owen had informed  Old South that masks could be put back on the EUA List. **TR 698:14-699:13; Ex OST-134.**

95.  However, Owen informed Mr. Church and Dream that the YIWU masks would be placed back on the EUA list because YIWU had a medical license. Actually, the YIWU masks had to be submitted for testing by the FDA. **TR 161:3 – 461:19**

96.  These masks were eventually sold to the state of Texas for $1.00 per mask. **TR 488:9-17; TR 489:8-9**

97.  On May 8, 2020, Mr. Agresti connected Mr. Church with a broker of airplanes who was purportedly going to assist Dream and Old South lease a 747 Cargo plane to more easily transport product into the US from  China. **TR 699:20-700:15; Ex OST-136.**

98.  The 7 million Transaction #3 Masks landed in LAX on May 12, 2020. Upon being informed of their arrival, Dream directed Old South to store them in Old South's warehouse and Dream would sell the masks from there because Dream did not have anywhere to store them. **TR 739:22-741:20.**

99.  If Dream wanted the 7,000,000 masks subject of Transaction # 3 at a discount, Dream was required to make a $3,000,000 deposit. **TR 649:5 – 650:25**

100.  Dream agreed to substitute 2,000,000 Henghao masks for the 2,000,000 Chengde. **TR 655:17-19**

101. Dream was able to receive the discount rate of $2.25 per mask for the 7,000,000 masks although Old South made the deposit. **TR 655:23 – 656:2**

102. Old South paid $7,000,000 for the 7,000,000 masks that were the subject of Transaction # 3. **TR 656:3-15**

103.  As of May 12, 2020, the parties had engaged in multiple communication regarding various business issues, including the EUA List, and Dream had not cancelled the orders associated with Transaction # 2 or  Transaction # 3, or otherwise notified Old South that it did not intend to purchase the 7 Million Transaction # 3  Masks. **TR 701:1-704:25, 7109:2-**

**710:14, 739:22-741:20; Exs OST-138, OST-141, OST-142, OST-143, OST 151.**

104. By email dated May 15, 2020, Mr. Agresti sent Old South wiring instructions for "money due DMG on Monday" under the Resolution Agreement. **TR 711:18-712:4; Ex OST-157.**

105. Mr. Church responded as if Mr. Agresti was joking. **TR 712:5-24; Ex OST-159.**

106. Mr. Agresti replied that he was exercising his option under the Resolution Agreement not to take the 2.5 Million Moway Transaction # 2 Masks. **TR 713:11-17.**

107. Mr. Church was purportedly uncertain if Mr. Agresti was serious or simply "showing out" for his investors, and called Mr. Agresti to clarify the intent of the email. During that conversation, according to Mr. Church, Mr. Agresti assured Mr. Church that this was simply an email to make the investors think the Resolution Agreement was legitimate, and if Old South could send a little money it would go a long way to get his investors off his back. **TR 713:18—714:25; Ex OST 160.**

108. On May 19, 2020, by email on which he copied Attorney Plott, Mr. Agresti asked Mr. Church to send him $1,535,000 that day. **TR 716:8-14: Ex OST-172.**

109. On May 20, 2020, Old South wired Dream $1.4 million. **TR 397:8-23, 717:20-21; Ex OST-175.**

110. A few days later, by email dated May 21, 2020, Dream refused to pay for the 7 Million Transaction # 3 Masks on the grounds that it had not yet even monetized the Moway Brand masks he had kept from Transaction # 2. **TR 722:6-723:7; Ex OST-181.**

111. By email dated May 26, 2020, on which Attorney Plott was copied, Mr. Agresti asked Old South to send Dream another $1,135,000. Old South ignored the email. **TR 724:19-725:6; Ex OST-183.**

112. Two days later, by email dated May 28, 2020, Attorney Plott contacted Mr. Church directly and (1) stated to Mr. Church that he represented "partners in DMG," that he was seeking information in that capacity, and (2) asked Mr. Church to reaffirm the debt allegedly owed by Old South to Dream under the Resolution Agreement, and (3) asked Mr. Church to confirm to Attorney Plott how and when he intended to pay the debt. **TR 228:19-233:23, 725:13-726:4; Ex OST-186, OST-187.**

113. Attorney Plott again asked Mr. Church how he intended to repay the debt under the Resolution Agreement. **TR 726:1-25; Ex OST-186, OST-187.**

114. By the end of May 2020, Dream had completely ceased buying any KN95 masks from

Old South. **TR 615:23-616:19**.

115. In the last few days of May 2020, Claimants ceased communicating with Respondents regarding: (a) the DMG Brochure and any future long-term supply-chain agreement; (b) any further KN95 mask purchases; (c) any United Airlines Deal, (d) any purchase of a Cargo Plane, or (e) any other ongoing business that had been the topic of discussion for weeks. Instead, Claimants' primary interest became when they could collect money they claimed was owed under the Resolution Agreement. **TR 580:25-581:20, 732:16-734:13**.

116. After learning that Dream had sold 2 million non-EUA approved Masks to the state of Texas for $1 each, on June 17, 2020, Mr. Church contacted Mr. Agresti and asked if Mr. Agresti could help Old South sell any of the 2.5 Million Moway Masks from Transaction # 2 or the 7 Million Transaction # 3 Masks to Texas for the same price. Mr. Agresti said he could not help Old South. **TR 744:20-745:16**.

117. Of the 10 million masks Dream returned or refused to purchase, at the time of this Trial, Old South was still in possession of 2,545,000 of the 3 million masks from Transaction # 2 returned under the Resolution Agreement, and 6.3 million of the 7 Million Transaction # 3 Masks Dream refused to purchase. **TR 686:-689:21**.

118. Mr. Agresti had previously admitted in his deposition that his actual damages totaled at most approximately $4 million. **TR 318:23- 320:11.**

119. The accounting records evidencing the amounts owed by Old South to Dream is the Resolution Agreement. **TR 277:15-280:21; Ex OST-296 (G)**.

120. However, Mr. Agresti testified his out of pocket losses were $7,600,000 of which $5,188,000 was based on the Resolution Agreement and also another $2,500,000 based on the Resolution Agreement. **TR 318:13-22**

121. On April 27, Agresti sent Church a draft Supply Agreement covering a proposed purchase of 5,000,000 Baiyis. (Exh. 7-31, OS 1268 and 1269).

122. On the morning of April 28, Church responded to Agresti with proposed changes to the draft Supply Agreement demanded by Church's attorney Tucker Herndon. (Exh. 7-36, DRE2756). Church/Old South offered no evidence indicating that Agresti ever agreed to those changes.

123. A few hours after sending those changes to the draft Supply Agreement (which were untenable to Agresti), Church advised Agresti by email that the Baiyis masks could no

longer be obtained because his upstream supplier SHA had a fight with the Baiyi factory. (Exh. 7-37).

124. The next day, Church advised Agresti that the Baiyis were again available; Agresti responded that it was too late. (Exh. 7-46).

125. Church claimed Dream became obligated to purchase 7,000,000 KN95 masks for a price of $16,100,000, but he admitted all 7,000,000 masks had to be EUA masks. (TR. 856, 859-60).

126. Church sent Agresti an invoice for $16,100,000, an invoice Church relied on at trial to establish a contract existed, and that invoice specifically noted the EUA requirement (Exh. 7-5). (TR 925, noting all invoices relating to the 7,000,000 masks listed the EUA requirement).

127. Church also invoiced Agresti for several other "mask orders" in aggregate totaling over $100 Million, though Church does not contend any of those "orders" constituted enforceable contracts. (Exh. G-11, DRE12616-20 & 12612-15).

128. Old South was not able to deliver EUA listed masks because, according to Church, all KN95 masks *other than masks manufactured by 3M Corporation* were removed from that list on May 7. (TR. 856-57). Church's 5,000,000 Baiyi masks arrived in the US on May 13. (TR. 856).

129. Church and Old South, in paragraph 38 of Respondents' March 31, 2021 Counterclaim, stipulated that the Resolution Agreement "was what Old South and Mr. Church believed to be the……compromise and resolution to the issues with Transaction #2, Transaction #3 and Transaction #4."

130. In essence, Church contends it was fraudulently induced to sign the Resolution Agreement, but the evidence is mixed.  Indeed, Church and OST initially refused to sign the Resolution Agreement, and Church even responded to Mr. Agresti, "*like you taught me, I would never be dumb enough to sign this.*" **TR 344:24-345, 675:1-3; Y-12**.

131. Church now claims he signed only because of Mr. Agresti's representations, but these are two sophisticated business persons, with full access to legal and other expertise, who entered into the Resolution Agreement.  The Panel is not persuaded that fraudulent

inducement has been demonstrated by a preponderance of the evidence.

132. Tex. Bus. & Comm. Code §2.601 ("if the goods or the tender of delivery fail *in any respect* to conform to the contract, the buyer may reject the whole, accept the whole or accept any…unit… and reject the rest"); Tex. Bus. & Comm. Code § 2.711 ("where the seller fails to make delivery… the buyer may cancel…in addition to recovering so much of the price as had been paid").

133. However, even if Church/Old South were fraudulently induced to sign the Resolution Agreement, their claim for rescission must fail. Church/Old South are asking to rescind only *their* obligations under the Resolution Agreement while retaining the benefits they received, while Dream/Agresti have upheld and performed their obligations. Texas law does not allow a rescinding party to have it both ways.

134. The Resolution Agreement satisfies all common law and statutory requirements for an enforceable contract in that it is in writing, offered and accepted as evidenced by the parties' signatures, supported by adequate consideration and is without ambiguity. *Yowell v. Granite Operating Co*., 620 S.W.3d 335, 353 (Tex. 2020), reh'g denied (Oct. 9, 2020) ("when parties narrow the scope of their rights and obligations purposefully, the Court must enforce the terms as expressed within the four corners of the contract"); *Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 432 (Tex. 2017) ("we must give effect to the parties' intent as expressed in the four corners of the document"). Church and Old South actively negotiated then signed the Resolution Agreement, and they repeatedly admitted in emails to owing $5,188,459.

135. Texas' UCC Article 2 governs the Resolution Agreement because it concerns the sale of goods. Tex. Bus. & Comm. Code § 2.102 ("this chapter applies to Transactions in goods"). Old South/Church made an express warranty that the Yiwus would have EUA status, they breached that warranty when the goods as delivered were not EUA-certified, and the UCC clearly provides relief to Claimants for damages suffered as a result of Respondents' breach.

136. Breach of Express Warranty. The elements of a UCC Article 2 express warranty claim are the following: "(1) an express affirmation of fact or promise by the seller relating to the goods; (2) that such affirmation of fact or promise became a part of the basis of the bargain; (3) that the plaintiff relied upon said affirmation of fact or promise; (4) that the goods failed

to comply with the affirmations of fact or promise; (5) that the plaintiff was injured by such failure of the product to comply with the express warranty; and (6) that such failure was the proximate cause of plaintiff's injury[.]" *Great Am. Prod. v. Permabond Int'l, a Div. of Nat'l Starch & Chem. Co.*, 94 S.W.3d 675, 681 (Tex. App. Austin 2002, pet. denied); *Morris v. Adolph Coors Co.*, 735 S.W.2d 578, 587 (Tex. App. Ft. Worth 1987, writ ref'd n.r.e.).

137. Under Texas law, the EUA certification made by Church/Old South (the Seller) to Dream/Agresti (the Buyer) constituted an express warranty. Tex. Bus. & Comm. Code § 2.313(a) provides, in part, that any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise". Church understood Agresti deemed EUA certification critical for the Yiwus – as he put it, "[Joe] just wanted to make sure it was on the EUA list". (TR. 421). EUA certification was therefore "part of the basis of the bargain." See *Sweco, Inc. v. Cont'l Sulfur & Chem.*, 808 S.W.2d 112, 115 (Tex. App. El Paso 1991, writ denied) (to be created, an express warranty need not be denominated as a warranty: "no specific intention to make a warranty is necessary and that no particular reliance on such statements need be shown")

138. Church contends it was defrauded, but the evidence is mixed at best. As noted above, Church concedes that he stated that he would have to be dumb to sign such a contract, but, with access to legal and other expertise, he nonetheless did so.

139. A party seeking rescission bears the burden of proof on the issue. *Morton v. Hung Nguyen*, 369 S.W.3d 659, 670 (Tex. App. – Houston 2012), *rev'd on other grounds sub nom. Morton v. Nguyen*, 412 S.W.3d 506 (Tex. 2013) ('[t]he party seeking equitable rescission bears the burden of proof"). Additionally, **"**Rescission is a harsh remedy generally not favored by the courts." *Holt v. Robertson*, No. 07-06-0220-CV, 2008 WL 2130420, at *5 (Tex. App.-Amarillo May 21, 2008 – pet. denied); citing *Little v. Kennedy*, 195 S.W.2d 255, 260 (Tex.App.-Amarillo 1946, writ ref'd n.r.e.). Church and Old South have not carried their burden to prove entitlement to rescission under Texas law, so it must be denied, for a host of reasons.

140. No Timely Notice. "Under Texas law, timely notice of an intent to rescind is an essential element of rescission." *Morton v. Hung Nguyen*, 369 S.W.3d 659, 670 (Tex. App. 2012

Houston [14th Dist.]), *rev'd on other grounds sub nom. Morton v. Nguyen*, 412 S.W.3d 506 (Tex. 2013).

141. Under Texas law, the party seeking rescission cannot have continued acting on the contract at issue after knowing the grounds for rescission. *Carrow v. Bayliner Marine Corp.* 781 S.W.2d 691, 696 (Tex.App – Austin 1989). Based on the purported misrepresentation on which Church and Old South based their rescission claim at Trial – that the Resolution Agreement would not be enforced – Church knew of the grounds for rescission at the time that Resolution Agreement was executed. But the very same day and on subsequent days, Church continued to enforce and accept its benefits. In other words, Church continued acting under the Resolution Agreement after knowing the grounds for rescission. Under Texas law, this also precludes any claim for rescission.

142. One-sided Rescission.  Old South seeks to retain their benefits under the Resolution Agreement while being relieved of their burdens. Texas law does not permit that.

143. The party seeking rescission must show that he is not retaining benefits received under the contract. *Boyter v. MCR Const. Co*., 673 S.W.2d 938, 941 (Tex. App.-Dallas 1984, writ ref'd n.r.e); *Ginn v. NCI Building Systems, Inc.*, 472 S.W.3d 802, 842 (Tex. App.- Houston [1st Dist.] 2015, no pet.). The rescinding party must also show he offered to return any consideration received under the agreement. *Fazio v. Cypress/GR Houston I, L.P.*, 403 S.W.3d 390, 396 (Tex. App. [1st Dist.] – Houston 2013, pet. denied), accord *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 824 & 826 (Tex. 2012). The return of consideration and restoration/accounting usually must be pleaded. *Matter of Estate of Poe*, 591 S.W.3d 607, 649 (Tex. App.- El Paso 2019), review granted (Sept. 3, 2021) ("when a party seeks rescission of an instrument, they usually carry the burden to plead a willingness to repay the underlying consideration"); *Republic Cap. Grp., LLC v. Roberts*, No. 03-17-00481-CV, 2018 WL 5289573, at *3 (Tex. App. Austin Oct. 25, 2018 no pet.) (cleaned up) ("an essential element of rescission is that the party show it offered to return any benefits it received under the contract….[T]hat rule is one of justice, designed to ensure that parties do not repudiate an agreement while retaining benefits received by reason of the agreement").

144. Neither the counterclaim nor any evidence presented by Old South/Church contains allegations or proposals concerning actual return of consideration or an accounting to

restore the status quo ante, as repeatedly and consistently required by Texas courts. That they made no such offer is not surprising. Church and Old South received substantial benefits under the Resolution Agreement, including a $600,000 profit from the sale of the Yiwus, as well as avoiding Claimants' entitlement under the Texas UCC to a full refund of the $11,500,000 Agresti had prepaid to Old South – a right that Dream and Agresti bargained away when striking the Resolution Agreement.

145. Texas law is clear that the party seeking rescission of a contract cannot itself be in breach. *Williamson v. Davey*, 114 S.W. 195, 195 (Tex. Civ. App. 1908) (no rescission allowed because "plaintiffs first breached the contract …"); *Rodriguez v. Taylor, Bean & Whitaker Mortgage Corp.*, No. SA-12-CV-0039-OLG, 2012 WL 13028282, at *3 (W.D. Tex. Sept. 4, 2012) ("To establish an action for rescission, …plaintiff must show that he is not in breach of the contract").

146. Unclean hands is an equitable defense to the remedy of rescission. *Isaacs v. Bishop*, 249 S.W.3d 100, 110 (Tex. App. - Texarkana 2008, pet. denied) ("[s]ome authority suggests that a negligent party may not obtain rescission; substantial authority exists that unclean hands will preclude such relief").

147. When a seller cannot deliver goods as promised, even if for reasons beyond the seller's control, under Texas UCC Article 2 the underlying contract <u>automatically</u> terminates, unless the buyer affirmatively modifies that agreement. Tex. Bus. & Comm. Code §§ 2.615 & 2.616. Church and Old South presented no evidence, and did not argue, that the purported contract had been modified so as to remove the EUA requirement.

148. Under Tex. Bus. & Comm. Code §2.615 and 2.616, where a seller's performance is impractical due to intervening circumstances (loss of EUA certification), the contract is <u>automatically terminated</u> as a matter of law unless the buyer affirmatively modified the contract to remove the EUA requirement.

149. As paragraph 38 of Old South's March 31, 2021 Counterclaim puts it: The Resolution Agreement attached as Exhibit 2 to Dream Medical's Statement of Claim, executed on May 5, 2020, (the "Resolution Agreement") was what Old South and Mr. Church believed to be the memorialization of the above compromise and resolution to the issues with Transaction #2, Transaction #3 and Transaction #4.

150. According to Old South/Church's own allegations, any prior dealings concerning a Transaction #3 were subsumed into and resolved in the Resolution Agreement. *Houston First Am. Savs. v. Musick*, 650 S.W.2d 764, 767 (Tex. 1983) ("Assertions of fact, not pled in the alternative, in the live pleadings of a party are regarded as formal judicial admissions."); *Gevinson v. Manhattan Cont. Co.*, 449 S.W.2d 458, 466 (Tex. 1969) ("The vital feature of a judicial admission is its conclusiveness on the party making it. It not only relieves his adversary from making proof of the fact admitted but also bars the party himself from disputing it."); both cited and quoted in *Univ. of Texas Health Sci. CTR. at Houston v. Rios*, 542 S.W.3d 530, 535 n.20 & 21 (Tex. 2017).

151. Given Church and Old South's admission that all prior dealings concerning "Transaction #3" were compromised and folded into the Resolution Agreement, any claim concerning a purported purchase of the 7,000,000 masks fails on its merits. *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 743 (Tex. 2020) ("our task is to determine and enforce the parties' intent as expressed within the four corners of the written agreement"), citing *Perryman v. Spartan Tex. Six Capital Partners, Ltd.*, 546 S.W.3d 110, 117–18 (Tex. 2018). That is fatal on the merits.

152. Under Texas law, arbitration agreements covering only claims "arising under" the parties' agreement require that the rights and duties upon which the claim is premised must directly and closely relate to the performance of the contract containing the arbitration agreement. *Valero Energy Corp. v. Wagner & Brown, II*, 777 S.W.2d 564, 567 (Tex. App.- El Paso 1989), writ denied (June 13, 1990). Any "contract" for 7,000,000 masks, if it ever existed (it did not), must have been created prior to the Resolution Agreement and solely by reference to invoices and emails – it would have to exist independent of the Resolution Agreement. The Panel lacks authority to adjudicate a claim based on an alleged contract not in the Resolution Agreement. See 9 U.S.C. § 10(a)(4) (arbitrator award may be vacated where arbitrators exceed their powers); *Branch Law Firm, L.L.P. v. Osborn*, 447 S.W.3d 390, 395 (Tex. App. -Houston [14th Dist.] 2014, no pet.) ("the strong policy in favor of arbitration cannot serve to stretch an arbitration clause beyond the scope intended by the parties or to allow modification of the unambiguous meaning of the arbitration clause").

## III. CONCLUSION

153. The parties entered in the Resolution Agreement, which, absent fraud, is an enforceable contract.

154. The Tribunal finds that Old South was unable to prove its fraud in the inducement claim by a preponderance of the evidence.

155. Even if the Panel had found fraud in the inducement, Old South has not established its right to rescission.

156. Therefore, applying the law to the facts, the panel shall enforce the Resolution Agreement as executed by the parties.

157. Dream's claims for lost profits are too speculative. Had Dream been certain of the sale of the masks from Transaction # 2, it would not have refused to accept the entire supply of Moway masks but also the entire shipment of YIWU and BAIYA masks of Transaction # 3.

158. Further, Dream would not have proposed the sale of masks to the State of Texas at a loss.

159. Dream's losses are $5,188,489 and entitled to earn interest at 4% until paid beginning February 10th, 2022, plus attorney's fees in the amount of $262,636.00 and the cost of Arbitration to be provided by the AAA.

## IV. AWARD

160. Dream shall have and recover from Old South the amount of $5,188,459 within 30 days of the date of this award.

161. Dream, as the prevailing party, is entitled to recover its costs and reasonable and actual attorney's fees associated with this arbitration

162. Dream shall recover its reasonable and actual attorney's fees from Old South in the amount of $262,636 within 30 days of the entry of this award.

163. The administrative fees and expenses of the American Arbitration Association totaling $41,280.00 shall be borne $41,280.00 by Old South Trading Co, LLC and Brendan Church, and the compensation and expenses of the arbitrator(s) totaling $145,922.32 shall be borne $145,922.32 by Old South Trading Co, LLC and Brendan Church. Therefore, Old South Trading Co, LLC and Brendan Church has to pay Dream Medical Group, LLC, an amount of $89,136.16.

164. The administrative fees of the American Arbitration Association totaling $41,280.00 and the compensation of the Arbitration Tribunal totaling $145,922.32 shall be borne by Old South.  Therefore, Dream shall also recover the additional sum of $89,136.16 within 30 days of the entry of this award, representing that portion of said fees and compensation in excess of the apportioned costs previously incurred by Dream.

165. All masks in possession of Old South, related to the transactions with Dream, shall be sole property of Old South.

166. All damages and cost of arbitration if not paid prior to February 11, 2022, shall incur interest at the rate of 4% until paid.

167. This award is in full and final disposition of all claims and counterclaims submitted to this tribunal. All claims not expressly granted herein are hereby denied.


**January 10 , 2022**
**Date**

**Dwight Jefferson, Arbitrator**


**January 10, 2022**
**Date**

**Lee Kaplan, Arbitrator**


**January 10, 2022**
**Date**

**Scott Link, Arbitrator**

# Exhibit 1-A

## FINANCIAL SUMMARY

Case No.    01-20-0014-3854

**Dream Medical Group, LLC and Joseph A. Agresti, BIJ Motors TX, LLC**

*Administrative Fees and Expenses Incurred*

| | |
|---|---|
| AAA Initial Filing Fee for Claim: | $7,700.00 |
| AAA Proceed Fee for Claim: | $0.00 |
| AAA Final Fee for Claim: | $8,475.00 |
| AAA Additional Party Fees: | $0.00 |
| TOTAL ADMINISTRATIVE FEES INCURRED: | $16,175.00 |

*Arbitrator Fees and Expenses Incurred*

| | |
|---|---|
| Arbitrator Compensation Incurred: | $72,027.50 |
| Arbitrator Expenses Incurred: | $933.66 |
| TOTAL ARBITRATOR CHARGES INCURRED: | $72,961.16 |

| | |
|---|---|
| TOTAL OF ALL CHARGES INCURRED: | $89,136.16 |
| Total Payments Received: | $101,025.00 |
| End-of-Case Balance (Refund if Negative): | -$11,888.84 |

**Old South Trading Co, LLC and Brendan Church**

*Administrative Fees and Expenses Incurred*

| | |
|---|---|
| AAA Initial Filing Fee for Claim: | $11,355.00 |
| AAA Proceed Fee for Claim: | $0.00 |
| AAA Final Fee for Claim: | $13,750.00 |
| AAA Abeyance Fees: | $0.00 |
| TOTAL ADMINISTRATIVE FEES INCURRED: | $25,105.00 |

*Arbitrator Fees and Expenses Incurred*

| | |
|---|---|
| Arbitrator Compensation Incurred: | $72,027.50 |
| Arbitrator Expenses Incurred: | $933.66 |
| TOTAL ARBITRATOR CHARGES INCURRED: | $72,961.16 |

| | |
|---|---|
| TOTAL OF ALL CHARGES INCURRED: | $98,066.16 |
| Total Payments Received: | $96,205.00 |
| End-of-Case Balance (Refund if Negative): | $1,861.16 |